POPULAR DEMOCRATIC PARTY, et al., Plaintiffs,

v.

COMMONWEALTH OF PUERTO RICO, et al., Defendants.

No. Civ. No. 98–2004 PG.

United States District Court, D. Puerto Rico.

Oct. 13, 1998.

---

Lino Saldaña, Hato Rey, PR, for plaintiffs.

José A. Fuentes–Agostini, Attorney General, Gustavo Gelpí, Jr., Deputy Attorney General, Carlos Lugo–Fiol, Solicitor General, San Juan, PR, for defendants.

## OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

Before this Court is plaintiffs' motion to remand this action to the Court of First Instance of the Commonwealth of Puerto Rico and defendants' opposition to said motion. Having received oral arguments on the matter, this Court shall now rule on the plaintiffs' motion.

### I. Introduction: The 1998 Plebiscite & Plaintiffs' Complaint

On August 17, 1998, the Legislature of the Commonwealth of Puerto Rico approved Act No. 249 which provides for the occurrence of a plebiscite on December 13, 1998, in which Puerto Rican voters may express their preference from among several "political status or petition to the Federal Government options on the scope of United States sovereignty over Puerto Rico and the political condition of the citizens who reside on the [i]sland." *Act No. 249, Art. 2.* Once the Governor signed into law Act No. 249, the Popular Democratic Party, a principal political party of Puerto Rico, as provided by Art. 3.001 of the Electoral Act, 16 L.P.R.A. § 3101, as well as four individual voters affiliated with said political entity, filed the present complaint on September 3, 1998 against the Commonwealth of Puerto Rico, the State Elections Commission and its Commissioners, the New Progressive Party, and the Puerto Rican Independence Party, at the Court of First Instance of the Common-wealth of Puerto Rico, Superior Court of San Juan.

The plaintiffs raise six causes of action in their complaint. As drafted, all six of them seek relief based exclusively on the Puerto Rico Constitution. Defendants contend that the plaintiffs' first and fifth causes of action necessarily invoke the Court's federal jurisdiction.

The first cause of action of the complaint states that "Law No. 249 ... is discriminatory and affects the decision of the people of Puerto Rico with respect to its political destiny and its relations with the United States." *See Certified Translation of Complaint* at 16. The plaintiffs also allege in their first cause of action that "[t]he ballot and the definition of the Commonwealth status option [1] contradicts and does not allow a vote for the *present juridical status* of the Commonwealth of Puerto Rico recognized by the Constitution of Puerto Rico and the case law of the Puerto Rico Supreme Court." (Emphasis added). *Id.* This definition, plaintiffs claim, is misleading and deceitful. *Id.* at 17. The first cause of action also asserts that the definition of statehood [2] is biased and deceitful as well. *Id.* at 18.

The second cause of action essentially alleges that Law No. 249 forces the Popular Democratic Party to "abandon its platform and its political ideology" because of the definition of the Commonwealth status option that will be provided in the ballot. *Id.* at 20.

---

1. Law No. 249 provides that the Commonwealth status option in the ballot shall read as follows: "The application on Puerto Rico of the sovereignty of Congress, which by virtue of Federal Act 600 of July 3, 1950, delegates to the island the conducting of a government limited to strictly local affairs under its own Constitution. Said local government shall be subject to the authority Congress, the Constitution, the laws and the treaties of the United States. By virtue of the Treaty of Paris and the Territorial Clause of the United States Constitution, Congress may treat Puerto Rico differently from the states, as long as it does so on a rational basis. The American citizenship of the Puerto Rican people shall be statutory. English shall continue to be the official language of the agencies and courts of United States government operating in Puerto Rico."

2. Law No. 249 provides that the statehood status option in the ballot shall read as follows: "The entry of Puerto Rico to the Union of the United States of America as a sovereign state, with full equality of rights, responsibilities and benefits as the other states. The sovereignty of Puerto Rico shall also be retained in those affairs not delegated by the Constitution of the United States to the Federal Government. The right to vote for the president and to equal representation in the Senate and proportional representation in the House of Representatives, without impairment to the representation of the other states. Maintaining also the present Constitution of Puerto Rico and the same state laws; and with permanent American citizenship guaranteed by the Constitution of the United States of America. The provisions of the federal law on the use of the English language in the agencies and courts of the federal government in the fifty states of the Union shall apply equally to the State of Puerto Rico, as presently occurs."

According to this second cause of action, Law No. 249 violates the rights of equal protection, electoral equality, freedom of expression, freedom of association, and due process of the law protected by the Constitution of Puerto Rico. *Id.* at 20–21.

Because Law No. 249 prohibits any political party from advocating and promoting voters to choose the ballot option that states "none of the preceding", the third cause of action alleges that the Popular Democratic Party has been deprived of rights embedded in the Constitution of Puerto Rico like electoral equality, freedom of expression, equal protection of the laws, freedom of association, and due process of the law. *Id.* at 22. Such violation, plaintiffs allege, nullifies the plebiscite conceived by Law No. 249. *Id.* at 23.

The same rights of electoral equality, equal protection of the laws, freedom of expression and of association, due process of the law as provided by the Constitution of Puerto Rico are claimed in the fourth cause of action to have been violated with respect to individual plaintiffs Delia Castillo Ortiz, Gonzalo Fernós López, Elsa Tió Fernández, and Gregoria. Vázquez Rivera, as registered voters who are affiliated with the Popular Democratic Party. *Id.* at 23–24. Their right to "suffrage free from any coercion", the fourth cause of action continues, has been violated. *Id.* at 23.

The fifth cause of action alleges that while Law No. 249 pretends to give the impression that the House of Representatives of the United States has granted its approval of the status options described in Art. 4(2) of the Law, said options are "very different" from those approved by the House of Representatives in the 105th Congress of the United States in H.R.856, known as the "United States—Puerto Rico Political Status Act." *Id.*

at 27. In addition, the fifth cause of action complains about the fact that the "free association" option [3] included in Law No. 249 is nowhere to be found in H.R.856; the inclusion of such option allegedly has the purpose of splitting the vote of those affiliated with the Popular Democratic Party. *Id.* at 28. As to the Commonwealth status option provided by Law No. 249, plaintiffs allege that "it is misleading and deceitful because it affirms that ... Congress has delegated to Puerto Rico the conducting of a government limited to strictly local matters under its own constitution and that such government would be subject to the authority of Congress (Art. 4(2)(b)) without mentioning that under Commonwealth, Puerto Rico, as a state, is an autonomous political entity sovereign over affairs not regulated by the U.S. Constitution." *Id.* at 30. The fifth cause of action also complains about the fact that Law No. 249 orders that the status options in the ballots be identified by numbers rather than by the political status that they represent. *Id.* at 29.

Finally, the sixth cause of action alleges that one of the plaintiffs does not know how to read and that the absence of symbols to identify status options in the ballot violates her right to suffrage, equal protection of the laws, freedom of expression, and due process under the Constitution of Puerto Rico. *Id.* at 31–32.

Pursuant to 28 U.S.C. § 1441, the case was removed to this Court on September 3, 1998. Plaintiffs then filed the motion to remand the case to the Commonwealth court on September 8, 1998, opposed by defendants on September 11, 1998. Plaintiffs responded to defendants' opposition on September 28, 1998, and defendants replied on October 1, 1998.

---

3. Law No. 249 provides that the free association status option in the ballot shall read as follows: "A Treaty which recognizes the full sovereignty of Puerto Rico to develop its relationship with the United States in a non-colonial, non-territorial association. The United States shall renounce all of its powers over Puerto Rico, and shall enter the Treaty in the same act. Puerto Rico shall retain all powers which are not expressly delegated to the United States. Puerto Rico shall provide for Puerto Rican citizenship. The present citizens of the United States in Puerto Rico shall retain their American citizenship, if they so desire, and may transmit the same to their descendants, subject to the provisions of the laws of the United States or of the Treaty. It must be understood that, as of the effective date of the Treaty, the mere fact of being born in Puerto Rico shall not grant the right to be an American citizen. The Treaty to be negotiated shall provide for matters concerning trade, defense, the use of the dollar, financial aid, and the protection of acquired personal rights. The Treaty shall also recognize the sovereign capacity of Puerto Rico to enter into covenants and other international treaties."

Oral arguments were received by the Court on October 5, 1998.

Originally, in their motion to remand plaintiffs stated three reasons in opposition to removal: that this Court lacks subject matter jurisdiction, that it should abstain, and that the removal procedure was defective. Subsequently, plaintiffs argue in their response to defendants' opposition to motion to remove this case to the Court of First Instance of the Commonwealth of Puerto Rico that: (1) the grounds for removal do not arise from the face of plaintiffs' well pleaded complaint; (2) the artful pleading exception is inapplicable; (3) the purported grounds for removal constitute a defense; and (4) Puerto Rico's Constitution is not federal law.

## II. Federal Jurisdiction as Seen Through the Lens of Removal

### A. The Well Pleaded Complaint, Artful Pleading, & the Merrell Dow Standard

"District courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C § 1331. In order for a case or controversy to "arise under" federal law for purposes of § 1331 it must be clear or apparent from the face of the plaintiff's complaint that a federal question is at issue. *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). This requirement is generally referred to as the "well-pleaded complaint rule." *Verlinden, B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Hence, mere assertion of a federal law defense or its anticipation is not sufficient to grant a federal court jurisdiction. *Hernandez Agosto v. Romero Barcelo*, 748 F.2d 1, 2–3 (1st Cir.1984) (per curiam).

Two corollaries emerge from the well-pleaded complaint rule: First, a defendant may not remove a case from state court to federal court unless it is readily apparent from the face of the plaintiffs' complaint that there is a federal question. Second, "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal

in character." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). For instance, such complete preemption has been the case with § 301 of the LMRA, *Avco Corp. v. Aero Lodge No. 735 Int'l Ass'n Machinists & Aerospace Workers*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), and § 502 of ERISA. *Metropolitan Life Ins. Co., supra.*

A defendant also may not remove a case from state to federal court if the plaintiff voluntarily elects not to present an available federal claim. *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913) ("The party who brings a suit is master to decide what law he will rely upon and therefore does determine whether he will bring a 'suit arising under' ... [the] law of the United States.") Nevertheless, "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 22, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Just as artificial manufacturing of federal jurisdiction through technicalities—which has been referred to as "artful pleading"—is unsuccessful in opening the federal court's doors, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), failure to make specific reference in the complaint to a source of federal law that is clearly applicable or crafty evasion of federal jurisdiction is unable to shut them.

Plaintiffs argue that complete pre-emption is always required for removal to be proper when the complaint, on its face, raises state law causes of action only. Such argument is misleading. Of course, if defendants had merely raised a federal defense, federal jurisdiction would be lacking, *Gully v. First Nat'l Bank*, 299 U.S. 109, 115–118, 57 S.Ct. 96, 81 L.Ed. 70 (1936), and federal preemption, unless complete, is generally considered to be a federal defense. *Metropolitan Life Ins. Co. v. Taylor, supra*, at 63, 107 S.Ct. 1542. In *Rivet v. Regions Bank of Louisiana*, 522 U.S. ——, 118 S.Ct. 921, 925, 139 L.Ed.2d 912 (1998) (citations omitted), the Court held that "[t]he artful pleading doctrine allows removal where federal law completely preempts a state law claim." Howev-

er, neither *Rivet* nor *Metropolitan Life Ins. Co.* established an all-encompassing rigid rule. *Rivet*, unlike the present case, was addressing an issue of claim preclusion. As to *Metropolitan Life Ins. Co.*, "[f]urther evidence that [it] does not stand for the proposition that only complete preemption constitutes a substantial federal claim under *Smith [v. Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921) ] stems from the fact that it cites *Franchise Tax Board*, a case that makes it abundantly clear that the substantial-federal-question exception to the well-pleaded complaint rule extends beyond complete preemption." Arthur R. Miller, *Artful Pleading: A Doctrine in Search of Definition* 76 Tex.L.Rev. 1781, 1792 (1998) (citations omitted).

■ "In order to apply the standard prescribed in Section 1441(b), a federal court necessarily must attempt to ascertain the substantive underpinnings of the plaintiff's cause of action to see if the federal question required for removal jurisdiction is present." 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3722 (3d ed.1998). Thus, it is the duty of the Court to "look beneath the face of the complaint to divine ... whether the plaintiff has sought to defeat removal by asserting a federal claim under state-law colors ..." *BIW Deceived v. Local S6*, 132 F.3d 824, 831 (1st Cir.1997) (citations omitted). "If the claim appears to be federal in nature ... then the federal court must recharacterize the complaint to reflect the reality and affirm the removal despite the plaintiff's professed intent to pursue only state-law claims." *Id. citing Metropolitan Life Ins. Co., supra*, at 64, 107 S.Ct. 1542.

■ At a first glance to the case at bar, plaintiffs' complaint seems to invoke only state law causes of action and remedies. If indeed the complaint has been well plead, this court would not be able to exercise juris-

diction under those circumstances in the absence of diversity of citizenship. Yet, federal jurisdiction is not always so easily defeated: "[W]here it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction ..." *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199, 41 S.Ct. 243, 65 L.Ed. 577 (1921). *Smith's* rule, however, is not automatically triggered by the mere fact that the construction of a federal law probably will determine the outcome of a state law cause of action. *Moore v. Chesapeake & Ohio Ry.*, 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934).[4] The Court must carefully ponder "the nature of the federal issues at stake." *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 814 n. 12, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). Moreover, there is an additional hurdle that must be overcome before federal jurisdiction is found to exist: the resolution of the plaintiff's state law claim must hinge upon a federal statute that enables a private, federal cause of action. *Id.* at 817, 106 S.Ct. 3229. "Unless a federal statute bestows a private right of action, courts ought to presume that Congress did not intend the statute to confer federal jurisdiction." *PCS 2000 LP v. Romulus Telecomms., Inc.*, 148 F.3d 32 (1st Cir. 1998) (citations omitted). Therefore, *Merrell Dow* has narrowed *Smith's* rule to apply only when (1) the federal issue at stake is substantial and (2) a private cause of action has been provided by Congress.

■ The second prong of the *Merrell Dow* standard, however, must be qualified: "[I]t can be questioned whether the absence of a federal cause of action means that Congress intended to foreclose federal jurisdiction when the construction of the federal law will

4. *Smith* and *Moore*, although seemingly contradictory, can be distinguished. In *Smith*, the Court wrestled with constitutionality and application of a federal statute. *Moore*, on the other hand, dealt with state tort law that incorporated a federal component as one of its elements. "[T]he different results between *Smith*, on the one hand, and *Merrell Dow* and *Moore*, on the other, in fact might stem from a deliberate judicial choice to utilize scarce federal resources only when the importance of deciding the embedded federal question would be far-reaching." Arthur R. Miller, *Artful Pleading: A Doctrine in Search of Definition* 76 Tex.L.Rev. 1781, 1788 (1998).

be decisive in a state lawsuit. Congress may have thought it unnecessary to authorize suits for recovery; it does not follow that Congress decided it was unnecessary to have a federal court interpret the federal law in every instance." Erwin Chemerinsky, *Federal Jurisdiction* § 5.2.3 (1989). If there is a substantial federal question involved, federal jurisdiction exists even if there is no private federal cause of action; otherwise, it would be impossible to harmonize *Merrell Dow* with *Franchise Tax Board* and *Smith*.

*Merrell Dow* also did not alter "the distinct proposition—now well settled . . .—that causes of action that are properly 'implied' from federal statutes or the federal Constitution, or that are otherwise a creation of federal common law, do 'arise under' federal law within the meaning of § 1331 and its predecessors." Hart and Wechsler's *The Federal Courts and the Federal System* 1022 (Paul M. Bator et. al. eds., 3d ed.1988). *Merrell Dow* based its holding on the premise that federal common-law causes of action may not be implied from the Food, Drug, and Cosmetics Act, but said limitation was not extended to those cases in which the cause of action can be "properly implied" from federal law. "[E]ven if plaintiffs have no statutorily created federal action . . . ['arising under' jurisdiction exists if] their state claims encompass a substantial federal question. . . ." *West 14th St. Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188 (2nd Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987).

The federal courts, then, must exercise discretion in determining the importance of the federal issue involved without oversimplifying the analysis with rules of thumb. *See* Hart and Wechsler's *The Federal Courts and the Federal System* 1021 (Paul M. Bator et. al. eds., 3d ed. 1988) ("*[D]istrict* courts should exercise an ad hoc case-by-case discretion, unguided by any 'formulation', in determining whether jurisdiction is justified by 'pragmatic' factors"); Karen A. Jordan, *The Complete Preemption Dilemma: A Le-*

*gal Process Perspective*, 31 WAKE FOREST L.REV. 927, 946–947 ("[T]he test for 'arising under' jurisdiction under § 1331 must be approached with an 'eye to practicality and necessity.'") (citations omitted).[5] Thus, we now proceed with the scrutiny of the federal issue in the case at bar.

**B. The Overwhelming Federal Interest: The Treaty of Paris, the Territorial Clause & the Supremacy Clause of the Constitution of the United States of America**

■ It is impossible to comprehend the degree of the federal interest embedded in the plaintiffs' complaint without highlighting key events that have shaped the juridical status of Puerto Rico throughout the past 100 years. American jurisdiction came to the island in the first place not through any kind of will expressed by the people of Puerto Rico, but by the signing of the Treaty of Paris between American and Spanish officials as a result of the Spanish–American War of 1898. *Treaty of Peace*, Dec. 10, 1898, U.S.—Spain, 30 Stat. 1754, 1 L.P.R.A. 17. Article IX of the Treaty clearly provided that "the civil rights and *political conditions* of the natural inhabitants [of Puerto Rico] shall be determined by Congress." (Emphasis added). Shortly thereafter, Congress began to legislate for Puerto Rico pursuant to the United States Constitution's Territorial Clause, U.S. Const. Art. IV., Sec. 3, Cl. 2, which authorizes Congress to "dispose of and make all needful Rules and Regulations respecting the Territory" of the United States.

First, Congress established a civil government for Puerto Rico by enacting the Foraker Act, 31 Stat. 77 (1900) (codified as 11 U.S.C. §§ 1, 11), which provided for an elected legislature, and a governor and supreme court appointed by the President of the United States. Subsequently, by means of the Jones Act, 39 Stat. 951 (1917) (codified as 48 U.S.C. § 737), Congress granted Puerto Rico residents statutory United States citizenship

---

**5.** For an example of a district court decision balancing the federal interest at stake in a removal of a case stating state law claims only in the complaint, *see Grynberg Production Corp. v. British Gas, p.l.c.*, 817 F.Supp. 1338, 1356 (E.D.Tex.1993), holding that international relations "would seem to nearly always involve federal issues of such a 'substantial' nature as to warrant the exercise of jurisdiction."

and provided for an enhanced, bicameral elected legislature. The Elective Governor Act, Pub.L. No. 80–362, 61 Stat. 770 (1947), granting Puerto Rico residents the right to elect their own governor, was the next step in delegating a greater degree of internal autonomy to the island. These three acts of Congress did not alter the juridical status of Puerto Rico.[6]

The juridical status of Puerto Rico established by the Treaty of Paris, *supra*, was maintained when Congress enacted Public Law 600 in July 3, 1950. 64 Stat. 319 (codified at 48 U.S.C. § 731b et seq.). Said Law provided federal statutory authorization for the citizens of Puerto Rico to write their own constitution, subject to congressional approval. In essence, Congress simply instituted the mechanism by which a constitution would be drafted. Following this act of Congress, a local Constitutional Convention drafted a constitution for Puerto Rico and submitted it to Congress for approval. Congress approved the proposed constitution by means of Public Law No. 447, Act of July 3, 1972, 66 Stat. 327. But prior to approval, Congress exercised its plenary powers over Puerto Rico pursuant to the Territorial Clause. First, it eliminated Section 3[7] altogether and imposed in a unilateral manner the amendment of Section 5.[8] Additionally, Section 20 of the constitution's Bill of Rights was eliminated in its entirety.[9] Lastly, in a Joint Resolution of Congress,[10] an amendment was added to Article VII of the Puerto Rico constitution to ensure that any amendments to said constitution did not change the fundamental structures that defined United States—Puerto Rico Relationship. *See generally* 98 Cong. Rec. at 5119–28, 5126–27, 6184–86, 8715 (1952) (objections to Sections 5 and 20).[11]

It is worth noting that only federal law, rather than local law, has defined the juridical status of the island throughout the four congressional acts described above. The Constitution of Puerto Rico is silent about the juridical status of Puerto Rico. Congress,

---

6. In the so-called "Insular Cases", the Supreme Court identified the status of Puerto Rico as that of an "*unincorporated territory*" of the United States. Furthermore, the Court held that the Constitution of the United States did not apply *ex propio vigore* to Puerto Rico. In reaching its conclusion, the Court distinguished between "incorporated territories" that are assured statehood at some point in the future, and "unincorporated territories" that lack such assurance. The Constitution of the United States, held the Court, applied in full force in the former, but not in the latter. *See generally DeLima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Goetze v. United States*, 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Huus v. New York & Porto Rico Steamship Co.*, 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901). In *Balzac v. Porto Rico*, 258 U.S. 298, 312–313, 42 S.Ct. 343, 66 L.Ed. 627 (1922), the Court held that only "fundamental rights" applied to Puerto Rico.

7. Section 3 provided that if Congress failed to take action after receiving the constitution from the President, it would be considered approved.

8. Section 5 provided for compulsory attendance at elementary public schools to the extent permitted by the facilities. This mandate was not applicable to the recipients of elementary education in private schools.

9. Section 20 provided for the recognition of several human rights.

10. *See* 66 Stat. 327 (1952). The amendment reads: "Any amendment or revision of this Constitution shall be consistent with the resolution enacted by the Congress of the United States approving this [c]onstitution, with the applicable provision of the Constitution of the United States, with the Puerto Rican Federal Relations Act, and with Public Law 600 of the Eighty-first Congress, adopted in a nature of a compact." This condition was accepted and took effect on January 29, 1953.

11. As a matter of historical reality, Public Law 600 is the only federal law in which Puerto Ricans have been allowed to vote. In his book *The Supreme Court of Puerto Rico: The Doctrine of "Separate but Unequal"* (1985), Chief Judge Torruella forcefully argues and convincingly demonstrates that the island's political status has not changed since the United States acquired Puerto Rico in 1898. It can reasonably be concluded, then, that the ratification of Public Law 600 and the occurrence of the plebiscites in 1967, 1991 and 1993 were a clear expression of the wish of Puerto Ricans to embark in the course to eventual self-determination rather than the exercise of self-determination in itself. Jesús G. Román, *Does International Law Govern Puerto Rico's November 1993 Plebiscite?*, 8 La Raza L.J. 98, 131 (1995).

on the other hand, has not been silent. The concurring statements of Representative Crawford and Delegate Barlett of Alaska during the debate on Public Law 600 asserted without hesitation: "Congress retains all essential powers set forth under our constitutional system, and it will be Congress and Congress alone which ultimately will determine the changes, if any, in the political status of the island." 81st Cong., 2d Sess., Cong. Record, June 29 and 30, 1950, p. 9595.

Senate Resolution 279 of the 105th Congress, passed September 17, 1998, states emphatically: "[T]he political status of Puerto Rico can be determined *only* by the Congress of the United States." (Emphasis added). The House of Representatives of the 105th Congress left no doubt of which law is to govern Puerto Rico's status when it enacted H.R.856: "Under the Territorial Clause of the Constitution, Congress has the authority and responsibility to determine Federal policy and *clarify status issues in order to resolve the issue of Puerto Rico's final status.*" H.R.856, Sec. 2(12) (Emphasis added). Said Act elaborated even further on the issue of whether Public Law 600 altered in any way the juridical status of the island: "The approved constitution established the structure for constitutional government in respect of internal affairs *without altering Puerto Rico's fundamental political, social, and economic relationship with the United States and without restricting the authority of Congress under the Territorial Clause* to determine the application of Federal law to Puerto Rico, resulting in the present 'Commonwealth' structure for local self-government. The Commonwealth *remains an unincorporated territory and does not have the status of 'free association' with the United States as the status is defined under United States law or international practice.*" *Id.* at Sec. 2(4). (Emphasis added). Therefore, since 1950 until the present, Congress has never

strayed from uniformly and consistently holding the same view as to who has the final authority to define the juridical status of the island.

There are those who argue that state law also governs the definition of Puerto Rico's juridical status because Public Law 600, in authorizing a local constitution, makes reference to such action as being "in the nature of a compact."[12] However, "[o]verwhelming evidence exists that before, during, and after the approval of Public Law 600, Congress did not intend to change the fundamental status of Puerto Rico from that of an unincorporated territory or to relinquish its plenary authority." Juan R. Torruella, *¿Hacia dónde vas Puerto Rico?*, 107 YALE L.J. 1503 (1998) (book review). *See also* José Trías Monge, *Puerto Rico: The Trials of the Oldest Colony in the World* 110–118 (Yale Univ. Press 1997) (Tras Monge, a constitutional scholar, former Chief Justice of the Supreme Court of Puerto Rico, and member of the Constitutional Convention, reaches the same conclusion as Torruella regarding the unaltered status of Puerto Rico despite the enactment of Public Law 600).[13] Of course, implicit in the fact that Puerto Rico's status has not changed is the continuance of federal law as the only source of definition of said status, as was established in the Treaty of Paris.

Legislative history confirms that Public Law 600 did not change the status of Puerto Rico. During the hearings on Public Law 600, both Luis Muñoz Marín, Governor of Puerto Rico, and Antonio Fernós Isern, Resident United States Commissioner, testified that Congress would retain unilateral power over Puerto Rico pursuant to the Territorial Clause of the Constitution. *See* H.R.7644 (Hearings Before the House Committee on Public Lands) and S.3336, 81st Cong. 33, 63 (1950).[14] The Secretary of Interior and the

---

12. *See supra* note 10.

13. *See also* other works by Trias Monge in which he paints a true picture of Puerto Rico's relationship to the United States and describes the same in terms of a colony: *Historia Constitucional de Puerto Rico* 1–5 (1980—); *El Estado Libre Asociado ante los Tribunales*, 64 REV.JUR. UPR 1 (1995).

14. Muñoz Marín testified that "Congress can always get around and legislate again." Antonio Fernós Isern stated that Public Law 600 "would not alter the powers of sovereignty over Puerto Rico under the terms of the Treaty of Paris." He added, "the authority of the Government of the United States, of the Congress, to legislate in case of need would always be there." *See Hearings before the House Committee on Public Lands*

Chief Justice of the Supreme of Puerto Rico testified that the "legal relationship between Puerto Rico and the United States remains intact." *Id.* at 54, 63.[15]

In *Mora v. Torres*, 113 F.Supp. 309, 314 (D.P.R.1953), *aff'd sub. nom., Mora v. Mejias*, 206 F.2d 377 (1st Cir.1953), the district court adopted the compact theory by stating that in 1952 Congress had "grant[ed] away" its plenary powers pursuant to the Territorial Clause.[16] However, this view has been greatly weakened by subsequent decisions from the Supreme Court of the United States affirming the legal reality that Congress retains and continues to exercise plenary powers over Puerto Rico pursuant to the Territorial Clause and that the status of Puerto Rico did not change with the advent of the Constitution of Puerto Rico. *See Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (per curiam); *Califano v. Torres*, 435 U.S. 1, 3 n. 4, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam). These cases permitted Congress to discriminate and treat Puerto Rico differently from the States so long as there exists a rational basis for its actions. Juridically speaking, Puerto Rico continues to be an unincorporated territory of the United States, meaning that United States citizens residing in the island only enjoy fundamental constitutional rights. *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), the legal precedent for this doctrine, continues to be in effect. *See Torres v. Puerto Rico*, 442 U.S. 465, 469, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); *Posadas de Puerto Rico v. Tourism Co.*, 478 U.S. 328, 331 n. 1, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).

The First Circuit also implicitly recognized that Puerto Rico is subject to the Territorial Clause by using it as a conduit to apply the dormant Commerce Clause to the island. *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 6–7 (1st Cir.1992). While in *United States v. Quinones*, 758 F.2d 40, 41 (1st Cir.1985), the First Circuit stated that "in 1952, Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress," the inaccuracy of this opinion is reflected by the fact that it was based on *Mora v. Mejias, supra*, which was seriously debilitated by subsequent Supreme Court pronouncements. Additionally, it fails to consider, mention or distinguish the legislative history of Public Laws 600 and 447, as well as the *Harris* and *Califano* Supreme Court rulings. Furthermore, this Court wholeheartedly concurs with Judge Laffitte's observation in *New Progressive Party v. Hernandez Colon*, 779 F.Supp. 646, 661 n. 20 (D.Puerto Rico 1991) that the statement about Puerto Rico's status in *Quinones* was dictum. *See also United States v. Sanchez*, 992 F.2d 1143, 1152 (11th Cir.1993) ("With each new organic act, first the Foraker Act in 1900, then the Jones Act in 1917, and then the Federal Relations Act in 1950 and later amendments, Congress has simply delegated more authority to Puerto Rico over local matters. But this has not changed in any way Puerto Rico's *constitutional* status as a territory, or the source of power over Puerto Rico. Congress continues to be the *ultimate source of power* pursuant to the Territory Clause of the Constitution.") *citing U.S. v. Lopez Andino*, 831 F.2d 1164, 1176 (1st Cir.1987) (Torruella concurring).[17]

on *H.R.7674* and *S.3336*, 81st Cong., 2d Sess., 17–34 (1950). Senators O'Mahoney and Butler, sponsors of S.3336, stated a similar view by clarifying that the bill would not alter the United States—Puerto Rico relationship.

**15.** Both the House and Senate Reports recollected the views of the sponsors of the bills as well as those expressed by the witnesses who testified on the issue of the allocation of power between the United States and Puerto Rico. Overwhelmingly, the opinions were that "the measure would not change Puerto Rico's fundamental, social, and economic relationship to the United States." *Id.* S.Rep. No. 1779 June 6, 1950 accompanying S.3336 and H.Rep. No. 2275 ——, 1950 accompanying H.R.7674. *See also* David M. Helfeld:

*Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico*, 21 Rev.Jur.U.P.R. 255 (1952).

**16.** Although C.J. Magruder referred to "the compact" in his opinion affirming the district court denial of an injunction, his "cautioning that its true nature 'deserv[ed] careful study and consideration' " proved to be correct. Juan R. Torruella, *¿Hacia dónde vas Puerto Rico?*, 107 Yale L.J. 1503, 1516 (1998) (book review).

**17.** In his concurrence, J. Torruella cited several cases from other circuits that support the proposition in *Sanchez: Americana of Puerto Rico v. Kaplus*, 368 F.2d 431, 436 (3rd Cir.1966); *Detres*

In *U.S. v. Lopez Andino,* 831 F.2d 1164 (1st Cir.1987) Chief Judge Torruella elaborated on the juridical status of Puerto Rico: "[T]he Puerto Rican Federal Relations Act [Pub.L. No. 600, 64 Stat. 319 (1950) ] is merely an act of Congress. It is not a treaty, and certainly not a part of the Constitution. Thus, under well-established constitutional precedent, as an act of Congress it does not bind future Congresses." *Citing Community–Service Broadcasting of Mid–America, Inc. v. Federal Communications Commission,* 593 F.2d 1102, 1103 (D.C.Cir. 1978).

Even after the enactment of Public Law 600, Congress has not hesitated to treat Puerto Rico as a territory. In the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301 *et seq.,* Sec. 20(a), 21(a), and (31), Congress explicitly defined Puerto Rico as a "possession." Thus, the Act applied to Puerto Rico intraterritorially. *Id.* The States, on the other hand, were exempted from the Act unless some degree of interstate or foreign commerce was involved. *Id.* In 1984, Congress acted *unilaterally* by not returning to the Treasury of Puerto Rico the excise tax on Puerto–Rican produced rum in excess of $10.50 a gallon.[18] The fact cannot be overlooked that Congress did not feel constrained by Section 9 of the Federal Relations Act which provides that "taxes collected ... on articles produced in Puerto Rico and transported to the United States ... shall be covered into the Treasury of Puerto Rico."

Yet the most clear expression of the plenary powers of Congress over Puerto Rico since the enactment of Public Law 600 is the derogation from the Internal Revenue Code of Section 936 of 1976. Section 936 permitted U.S. corporations to offset the United States tax on their possessions income with a tax credit. Tax Reform Act of 1976, Pub.L. 94–455, sec. 1051, 90 Stat. 1643.[19] Once again in an unilateral manner, Congress terminated the Sec. 936 credit, effective for all tax years after December 31, 1995 with a limited phaseout until December 31, 2005. 29 U.S.C. 936; Small Business Job Protection Act of 1996, Pub.L. 104–188, Sec. 1601(a), 110 Stat. 1827. Even outside the context of Section 936, "the current [federal] tax exemption that Puerto Rico enjoys is dangerously at the mercy of Congress because there is no basic principle of the United States Constitution preventing Congress from gradually extending its full taxing power to Puerto Rico." *U.S. v. Casablanca Motors,* 863 F.Supp. 50, 53 (D.Puerto Rico 1994).

Never was Puerto Rico's approval sought in the derogation of Sec. 936, in the enactment of the Federal Aviation Act or in the implementation of the legislation related to the rum excise tax. All of these laws of Congress reflect not agreements between equals "in the nature of a compact", but unilateral acts pursuant to the Territorial Clause of the United States Constitution.

The abundance of evidence leads this Court to conclude that "the compact is not a contract in a commercial sense. It expresses a method Congress chose to use in place of direct legislation. Through Public Law 600 Congress delegated a part of its legislative power to the people of Puerto Rico." David M. Helfeld, *Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico,* 21 *Rev.Jur.U.P.R.* 255, 307 (1952).[20] Since a contract was never made, Puerto Ricans cannot rescind an agreement that does not exist.

*v. Lions Bldg. Corp.,* 234 F.2d 596, 600 (7th Cir.1956); *Lummus Company v. Commonwealth Oil Refining Co.,* 195 F.Supp. 47, 50 (S.D.N.Y. 1961).

18. Statement of Senator Long regarding S.2246 to amend Section 7652 of the Internal Revenue Code, Cong.Rec., Senate. Feb. 1, 1984, pp. 689–90; Conference Report to accompany H.R.4170, Deficit Reduction Act of 1984, 98th Cong.2d Sess., Jun 23, 1984, pp. 711–13, 1418–20; Wagenheim, "Congressional Action Costs Puerto Rico Millions", Caribbean Business, June 27, 1984, p. 7; Wagenheim, "Congress Reacted to a Perceived Abuse", Caribbean Business, July 4, 1984, p. 7.

19. The Tax Reform Act also defined Puerto Rico as a "possession."

20. It is worth mentioning that Dr. Helfeld, a well-known constitutional scholar, has concluded that "the most meaningful view of the Puerto Rican [c]onstitution is that it is a statute of the Congress which involves a partial and non-permanent abdication of Congress' territorial power." *Id.*

Jesús G. Román, *Does International Law Govern Puerto Rico's November 1993 Plebiscite?*, 8 *La Raza L.J.* 98, 133 (1995). *See also* H.R.856, Sec. 2(4), *supra.*

 The legislative, judicial, and historical background of the relationship between the United States and Puerto Rico inevitably presents at its core a federal question of utmost importance not only to the government of Puerto Rico, but to the federal government as well. Jurisdiction properly lies in Federal Court. Any challenge or constitutional attack on the validity or legality of the "Commonwealth" definition provided in the local referendum is strictly dependent and solely based on a correct interpretation of the limited powers of self-governance granted under the Puerto Rico Federal Relations Act, 48 U.S.C. § 666(g). The Court is mindful that any referendum, such as this one, is not binding on Congress. *New Progressive Party v. Hernandez Colon,* 779 F.Supp. 646, 662 (D.Puerto Rico 1991). Nevertheless, the resolution of the lawsuit presently before this Court will necessarily entail a determination of whether the ballot definition of Commonwealth is a correct rendition of the power delegated by Congress to Puerto Rico under 48 U.S.C. § 666(g)—a power Congress exercised pursuant to Constitutional authority under Article IV, Section III, Clause 2 of the United States Constitution. Under the Supremacy Clause, the constitution and laws of Puerto Rico cannot limit the plenary power of Congress under the Territorial Clause, so as to provide for a relationship with the United States distinct to that provided by federal law. Plaintiffs' first and fifth causes of action do not merely invoke questions of purely local constitutional law regarding the rights and obligations amongst Puerto Rico's branches of government. *Hernandez Agosto v. Romero Barcelo,* 748 F.2d 1, 2–3 (1st Cir.1984) (per curiam). The issue raised, while labeled by plaintiffs in such terms, is inescapably and in reality one about the power of Congress to legislate for the island pursuant to the Territorial Clause. This very issue, as would necessarily be presented in the allegations of plaintiffs' well-pleaded complaint, necessarily raises a fundamental, essential, decisive, and outcome-determinative question of federal law that warrants the exercise of federal jurisdiction over the case at bar.

## III. Abstention

 Plaintiffs argue that this Court should abstain as allegedly required by *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *Pullman* sets a two-pronged test that must be satisfied in order for abstention to apply: (1) there must be substantial uncertainty as to the meaning of the state law and (2) there must be a reasonable possibility that the state court's resolution of state law issues would moot any federal constitutional ruling on the matter. *Id.* at 498–501, 61 S.Ct. 643. Both prongs must be satisfied before a Court may abstain under *Pullman. Guiney v. Roache,* 833 F.2d 1079, 1084 n. 4 (1st Cir.1987), *cert. denied* 493 U.S. 963, 110 S.Ct. 404, 107 L.Ed.2d 370 (1989), ("[t]he Supreme Court has frequently stressed that abstention is not justified by the mere possibility that a state court *might* interpret a state statute so as to alter or moot a federal constitutional question; abstention is only appropriate where state law is genuinely unsettled").

 The abstention doctrine should be invoked only in rare or "special circumstances." *Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (citation omitted); *see also Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (citations omitted); *Pustell v. Lynn Public Schools,* 18 F.3d 50, 53 (1st Cir.1994). Abstention is the exception, rather than the norm, "to the duty of a district court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959).

Law No. 249 is not ambiguous. It clearly provides for the realization of a plebiscite as a means for the 3.7 million people of Puerto Rico to petition Congress for a political status that finally redresses their grievances as citizens of the United States. Where state law is not ambiguous, a federal court ought not abstain. *Rivera–Puig v. Garcia–Rosario,* 983 F.2d 311, 322 (1st Cir.1992). Thus,

the *Pullman* abstention doctrine is inapplicable to this case. Plaintiffs recommend abstention on the basis of that a court from the Commonwealth of Puerto Rico should determine the constitutionality of Law No. 249. However, "to hold that abstention is required because [the challenged statute] might conflict [with state constitutional provisions] would convert abstention from an exception into a general rule." *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 598, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

Where jurisdiction is present, federal courts have a "virtually unflagging obligation . . . to exercise it." *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Therefore, plaintiffs' argument that this Court should abstain from the present case lacks merit.

## IV. Supplemental Jurisdiction

■ The second, third, fourth, and sixth causes of action of the complaint do not raise any federal questions. However, because of their very nature, these causes of action are inextricably intertwined with the first and fifth causes of action. "[D]istrict courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

■ "The exercise of supplemental jurisdiction over state-law claims is a matter purely within the discretion of the trial court." *Libertad v. Welch*, 854 F.Supp. 19, 35 (D.Puerto Rico 1993). Among the factors to consider in the exercise of such discretion, "a federal court should consider judicial economy, convenience, and fairness to the litigants." *Merino Vinas v. Boto*, 827 F.Supp. 83, 89 (D.Puerto Rico 1993), *aff'd in part, rev'd in part* by *Merino Calenti v. Boto*, 24 F.3d 335 (1st Cir.1994) (not addressing the supplemental jurisdiction matter); *citing Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720; *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 64 (2nd Cir.1991). Having taken all those factors into account, this Court finds that it is fair and efficient to exercise supplemental jurisdiction over the second, third, fourth, and sixth causes of action.

## V. Removal under 28 U.S.C. § 1441(b)

■ Plaintiffs contend that the removal procedure followed by defendants was defective because the Attorney General's notice of removal failed to make an explicit reference to the complaint of this case. This contention is unfounded. Title 28 U.S.C. § 1446(a) provides that the notice of removal must contain "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon defendant. . . ." The defendants' notice of removal in the case at bar contains a "short and plain statement of the grounds" relied upon for removal to this Court. *Commonwealth's Notice of Removal* at 3–4. Said notice of removal states that the complaint challenges a plebiscite on the political status of Puerto Rico. Moreover, 28 U.S.C. § 1441(b) (federal question removal) is specifically mentioned in defendants' notice of removal, explaining that one or more of the causes of action alleged by plaintiffs are necessarily "federal in character" because they pertain to the political relationship between the United States and Puerto Rico. *Id.* at 4.

Defendants' notice of removal was accompanied by a copy of the plaintiffs' complaint as well as of Law No. 249. Although a copy of state court process was not included, this was justified by the fact that at the time that the notice of removal was filed the Commonwealth had not yet been served with said process. Defendants were only required to file the notice of removal "together with a copy of all process, pleadings, and orders *served* upon such . . . defendants in such action." (emphasis added). 28 U.S.C. § 1446(a).

This Court was properly informed that the basis for removal was federal question jurisdiction. *See Grynberg Production Corp. v. British Gas, p.l.c.*, 817 F.Supp. 1338, 1354 (E.D.Texas 1993) (28 U.S.C. § 1441's requirements are satisfied by stating on the notice for removal that "one or more claims

in [the complaint] arise under the laws or treaties of the United States, which include principles of international law which form part of the federal common law . . .").

## VI. Conclusion

As a matter of law, the Court finds that the first and fifth causes of action of the complaint raise federal constitutional and statutory questions of the highest order, implicating the power of Congress over Puerto Rico pursuant to the Territorial Clause and the Supremacy Clause of the Constitution of the United States. The resolution of these federal questions is essential and outcome-determinative to both of these causes of action. For the reasons stated above, the Court also finds that it has supplemental jurisdiction over the other causes of action raised by the plaintiffs in their complaint.

**WHEREFORE,** the Court **DENIES** plaintiffs' motion to remand.

**IT IS SO ORDERED.**