Roberto **LEBRON DIAZ**,
et al., Plaintiffs,

v.

**GENERAL SECURITY SERVICES CORPORATION**, Defendant.

**No. CIV A 95–2595.**

United States District Court,
D. Puerto Rico.

April 24, 2000.

Juan R. Acevedo–Cruz, Hato Rey, PR, for plaintiffs.

Radames A. Torruella–del–Valle, Carmencita Velazquez–Marquez, McConnell Valdes, San Juan, PR, Robert A. Boonin, Buntzel Long, P.C., Detroit, MI, for defendant.

1. Subsequent to this litigation, the security contract for the First Circuit was awarded to another security service.

2. The following plaintiffs left their employment with GSSC while this case was pending: Hector Zayas (January 26, 1996); Martin

### MEMORANDUM

PONSOR, District Judge.

#### I. INTRODUCTION

Defendant, General Security Services Corporation ("GSSC"), provides security services to various private and governmental clients, including the United States Marshals Service ("USMS"). Under contract with the USMS, GSSC supplied security services at federal courthouses within the First Circuit, including the District of Puerto Rico.[1] Plaintiffs were employed by GSSC as Court Security Officers ("CSOs") at the federal courthouse in Hato Ray, Puerto Rico from 1992.[2]

In their complaint, plaintiffs allege two violations under Puerto Rico law: that defendant failed to pay each plaintiff an annual bonus of two percent of the individual's total wages ("Christmas bonus"), and that defendant's sick leave accrual policy of only five days per year is illegal.

Defendant moved for summary judgment on all claims arguing, among other things, that because the function of the CSOs was so entwined with the USMS, the CSOs were functionally identical to federal employees. Thus, according to defendant, federal law would preempt application of Puerto Rico's labor laws. This motion was ultimately denied, in part, based on disputed issues of fact regarding the relationship of the CSOs to the USMS, and the court heard testimony on the subject at the federal court in Puerto Rico.

Subsequently, this court, sua sponte, discovered a serious apparent defect in subject matter jurisdiction and ordered further briefing on this issue. The layered jurisdictional and substantive issues have been thorny, as the lengthy delay in issuing this opinion demonstrates. In the end,

Santiago (September 25, 1995); William Blanco Lopez (June 5, 1995); Daniel Rosa Cruz (June 12, 1995); Miguel A. Gonzalez (December 31, 1996); Wilfredo Medina Rosado (June 19, 1996); and Pedro J. Burgos (October 7, 1994).

and after considerable thought, the court can discover no way to avoid the conclusion that it lacks subject matter jurisdiction. The case will therefore be dismissed without prejudice and remanded to the courts of the Commonwealth of Puerto Rico for further proceedings.

Despite the order of dismissal, this memorandum will also address the substantive issues raised by the parties. For the reasons stated below, but for the jurisdictional defect, the court would enter judgment on liability in favor of the plaintiffs and establish a schedule for submissions to assist the court in calculating the damages to paid by the defendant. I have taken the somewhat unusual step of addressing the substantive issues, despite my conclusion regarding jurisdiction, in the hope that, given the amount of time the court has spent on this case, my *obiter dicta* will be helpful in some way to the Superior Court Judge in Puerto Rico who ultimately decides the case. In this way, further unnecessary delay will perhaps be avoided.

## II. PROCEDURAL BACKGROUND

On December 19, 1995, plaintiffs, CSOs employed by GSSC at the federal courthouse in Hato Ray, Puerto Rico, filed their complaint in the Commonwealth of Puerto Rico, Court of First Instance, Superior Court in San Juan. In their complaint, plaintiffs made two claims.[3] First, they argued that, under Puerto Rico law, they were entitled to an annual bonus of two percent of their total wages, amounting to four-hundred dollars for each plaintiff for each year of service. Second, plaintiffs alleged that defendant's sick leave accrual policy of five days per year violated Puerto Rico Law.

On December 29, 1995, on the basis of both diversity and federal question jurisdiction, defendant removed this case to the District of Puerto Rico. Plaintiffs did not object to removal. The case was originally assigned to Judge Perez–Gimenez. However, because the case involved plaintiffs charged with protecting the very judicial officer assigned to decide the case, the judge understandably recused himself. All judges of the District of Puerto Rico subsequently recused themselves for the same reason, and a visiting judge was requested through the First Circuit to hear the case.

In 1996, the case was assigned to Senior District Court Judge Francis J. Boyle in the District of Rhode Island. Soon thereafter, defendant moved for summary judgment, citing six grounds supporting a decision in its favor. First, relying primarily on *Paul v. United States*, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), defendant argued that the federal courthouse in San Juan was located in a federal "enclave," into which local employment laws could not enter. Second, relying primarily on *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), the defendant argued that, because the plaintiffs were functionally equivalent to federal employees, state law could not regulate their working conditions. Third, the defendant took the position that local laws were preempted by the federal Service Contract Act, 41 U.S.C. §§ 351–358 (1987). Fourth, defendant argued that local laws were preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461 (1999). Fifth, defendant maintained that Puerto Rico's Mandatory Decree No. 74, affording certain employment rights to "guards" was inapplicable because CSOs are not guards. Finally, defendant took the position that the plaintiffs' claims for a Christmas bonus are barred by the doctrine of *res judicata.*

Judge Boyle referred the motion to Magistrate Judge Timothy M. Boudewyns for a report and recommendation. On Oc-

---

**3.** Plaintiffs later withdrew a third claim, that GSSC violated Puerto Rico's Minimum Wage law.

tober 3, 1996, Magistrate Judge Boudewyns recommended that defendant's motion for summary judgment be denied as to all six arguments. Objections were filed to the recommendation on four of these. No objection was raised to the Magistrate Judge's recommendation that the ERISA preemption and *res judicata* arguments were insufficient to support summary judgment. Thereafter, Judge Boyle took no action on the defendant's four objections.

In December 1997, the case was reassigned briefly to Judge Mary M. Lisi of the District of Rhode Island. At her request, the parties, in an attempt to foster resolution of the case, submitted joint stipulations of fact. Based on these stipulations, and the parties' prior objections, Judge Lisi concluded that an evidentiary hearing was necessary. Because Judge Lisi was not available to conduct the hearing, on March 3, 1998 the case was assigned to this court.

On April 20, 1998, this court issued a memorandum ruling on the four objections to Magistrate Judge Boudewyns' Report and Recommendation. This court found that defendant's arguments as to the preemptive effect of the Service Contract Act and the applicability of Mandatory Decree No. 74 were incorrect as a matter of law. It further concluded that disputed issues of fact requiring an evidentiary hearing precluded summary judgment on defendant's contention, under *United States v. New Mexico,* that the CSOs were, in essence, identical to federal employees. Finally, the court indicated that further briefing and oral argument would be needed on defendant's "enclave" argument.

On April 27 and 28, 1998, at the federal courthouse in Hato Rey, Puerto Rico, the court heard evidence on the *New Mexico* issue, and oral argument on defendant's enclave argument. Supplementary memoranda were filed in May 1998 following the hearing. At the same time the defendant moved for reconsideration of the court's April 20, 1998 ruling on two of its objec-

tions to the report and recommendation on the motion for summary judgment. Specifically, it asked the court to find, despite its earlier rulings, that the Service Contract Act *did* preempt local labor laws and that Mandatory Decree No. 74 did *not* apply to CSOs. Further memoranda on the motion for reconsideration were filed in June and July 1998.

As noted earlier, in reviewing counsel's submissions and the evidence presented at the hearing, the court discovered an apparent problem affecting subject matter jurisdiction. On September 4, 1998, therefore, the court ordered filing of additional memoranda on this issue, with particular attention to Judge Gierbolini's decision in *Sopena v. Colejon Corp.,* 920 F.Supp. 259 (D.Puerto Rico 1996). After various extensions these submissions were received in November 1998.

### III. SUBJECT MATTER JURISDICTION

In the original removal papers, defendant cited two bases for jurisdiction: diversity jurisdiction under 28 U.S.C. § 1332 (1999), and federal question jurisdiction under 28 U.S.C. § 1331 (1999). It is now clear, unfortunately, that neither basis for the exercise of jurisdiction enjoys any support as a matter of law. Because the court lacks jurisdiction, the case must be remanded back to the Superior Court in San Juan.

 Absence of jurisdiction to hear a particular case is an issue that may be raised at any time, even on appeal, and may be raised by a judge, *sua sponte.* See *In re Healthco International,* 136 F.3d 45, 50 n. 4 (1st Cir.1998). Even where parties would prefer a case to remain in federal court, the jurisdictional requirement may not be waived. See *Irving v. United States,* 162 F.3d 154, 161 (1st Cir.1998). A defect in subject matter jurisdiction is always fatal to a complaint. See Fed. R.Civ.P. 12(h)(3); *Pallazola v. Rucker,* 797 F.2d 1116, 1128 (1st Cir.1986). Jurisdic-

tion may be exercised by federal courts where diversity of citizenship exists and the jurisdictional amount is satisfied, or where there is a federal question. Neither basis for jurisdiction exists here.

## A. *DIVERSITY JURISDICTION*

Diversity jurisdiction exists when the complaint asserts claims between citizens of different states and when the matter in controversy exceeds the sum or value of $50,000, not including interest and costs. 28 U.S.C. § 1332 (1995).[4] In this case, the diversity of the parties is not at issue. Plaintiffs are all residents of the Commonwealth of Puerto Rico. Defendant's principal place of business is not the Commonwealth of Puerto Rico, nor is it incorporated there. Complete diversity, therefore, exists. The second component of diversity jurisdiction, amount in controversy, however, is lacking.

This case involves claims of multiple plaintiffs against a single defendant. It is clear from the allegations in the complaint that each individual plaintiff asserts entitlement to back pay and wages significantly below the $50,000 jurisdictional requirement.[5] Therefore, to meet the requirements of diversity jurisdiction, the claims must be common and undivided so that they may be aggregated. *See Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); *Sopena v. Colejon Corporation*, 920 F.Supp. 259, 262 (D.Puerto Rico 1996).

█ For the reasons set forth by Judge Gierbolini compellingly in *Sopena*, the claims here may not be aggregated to satisfy the $50,000 minimum. Plaintiffs, like the plaintiffs in *Sopena*, are asserting entitlement to back pay and benefits under Puerto Rico's labor laws. The amount each plaintiff may be entitled to will be different based on hours worked and the length of employment. Consequently, plaintiffs' claims are distinct and separate. Similar claims of employees have consistently been held to be distinct and separate. *See id.* at 262–263 (listing cases).

Although not discussed in *Sopena*, there is one case that, at first blush, appears to reach the opposite conclusion. In *Local Division No. 714, Amalgamated Transit Union, AFL–CIO v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir.1978), the court held that union member plaintiffs *could* aggregate their claims to meet the jurisdictional amount required. In reaching this conclusion, however, the court found significant the fact that the particular claim asserted could *not*, because of the union agreement, be asserted individually. *See id.* at 10. By contrast, each plaintiff in this case could sue individually for the back pay and benefits to which he or she claims entitlement.

In conclusion, plaintiffs' claims cannot be aggregated. Since plaintiffs individually fail to meet the amount in controversy requirement of 28 U.S.C. § 1332, no diversity jurisdiction exists.

## B. *FEDERAL QUESTION JURISDICTION*

The district court has original jurisdiction over all civil actions "arising under" the Constitution or laws of the United States. 28 U.S.C. § 1331 (1997). When, as here, the case is originally filed in state court and defendant attempts to remove the case on the basis of the federal court's original jurisdiction, the court must determine whether the complaint asserts a claim that "arises under" the Constitution or laws of the United States. *See Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). This

---

**4.** Because the complaint was filed on December 19, 1995, the 1996 act increasing the amount in controversy to $75,000 is inapplicable. *See* Pub.L. No. 104–317, 1996 U.S.C.C.A.N. 4202 (taking effect 90 days after the date of enactment, or January 19, 1997).

**5.** If successful, most of the plaintiffs would receive between $2,000 and $10,000.

requirement is commonly referred to as the "well-pleaded" complaint rule.

> [T]he governing removal jurisdiction principle is this: the right or immunity created by the Constitution, a treaty, or some meaningful aspect of federal law that is claimed to provide the basis for bringing the state court case into the federal system by way of removal must be an essential element of the plaintiff's properly pleaded claim for relief.

14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722 (3d ed.1998).

If it appears that plaintiffs' right to relief rests upon the Constitution or laws of the United States, the district court has jurisdiction. *See Popular Democratic Party v. Puerto Rico*, 24 F.Supp.2d 184, 189 (D.Puerto Rico 1998) (citing *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199, 41 S.Ct. 243, 65 L.Ed. 577 (1921)). The mode of analysis is straightforward. On the one hand, plaintiffs may not use creative pleading to *avoid* removal into federal court; they may not disguise an obvious federal claim as a cause of action under the common law or a state statute. *Popular Democratic Party v. Puerto Rico*, 24 F. Supp. 2d 184, 188 (D.Puerto Rico 1998) ("[C]rafty evasion" of federal jurisdiction not permitted). On the other hand, the federal claim cited by defendant to support removal must be more than merely colorable. *See Smith*, 255 U.S. at 199, 41 S.Ct. 243.

Moreover, except in one circumstance, if the federal claim is raised merely as a defense, it is insufficient to support jurisdiction. *See Hernandez–Agosto v. Romero–Barcelo*, 748 F.2d 1 (1st Cir.1984). The one exception to this rule is when a defendant removes the case on the basis of a valid complete preemption defense. *See* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722.1 (3d ed.1998). Complete preemption occurs where "Congress [has] so completely preempt[ed] a particular area that any civil complaint

raising this select group of claims is necessarily federal in character." *BIW Deceived v. Local S6, Industrial Union of Marine and Shipbuilding Workers of America, IAMAW District Lodge 4*, 132 F.3d 824, 831 (1st Cir.1997) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)). Examples of cases subject to complete federal preemption would be lawsuits relating to employee benefit plans, which are governed by the federal ERISA statute, or complaints arising out of the collective bargaining context, which are exclusively governed by the Labor Management Relations Act ("LMRA"). *See, Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Avco Corp. v. Aero Lodge No. 735 Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968).

Where federal law is completely preemptive, the district court will "recharacterize the plaintiff's state cause of action as a federal claim for relief, making the removal proper on the basis of federal question jurisdiction." *See* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722.1 (3d ed.1998).

■ To decide whether complete preemption exists, the district court must find three things: first, that Congress intended federal law to occupy the entire regulatory field; second, that federal judicial power properly extends to actions originally filed in state courts to the extent that they touch upon that field; and third, that the exercise of federal power does not offend principles of federalism. *See BIW Deceived*, 132 F.3d at 832.

In their opposition to dismissal, plaintiffs make a creative argument in favor of this court's original jurisdiction by asserting, in essence, complete preemption. Plaintiffs concede that the complaint as originally filed does not explicitly assert a claim under the Constitution or laws of

the United States. Indeed, the heart of plaintiffs' claim is that defendant violated *Puerto Rico's* laws conferring employment benefits on the plaintiffs. They argue, however, that this case "arises under" the Constitution and laws of the United States, because it presents a substantial federal question involving interpretation of the federal "enclave" doctrine and application of the Service Contract Act ("SCA"), 41 U.S.C. §§ 351–358 (1987).

As a threshold matter, it must be noted that the enclave doctrine is not a federal "law," but is derived from U.S. Const. art. I, § 8, cl. 17. This provision gives Congress the power "[[t]o exercise exclusive Legislation in all Cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings....]"[6] U.S. Const. art. I, § 8, cl. 17.

This constitutional provision cannot be interpreted, like ERISA or the LMRA, as an expression of Congress' intent to occupy an entire field to the extent that all state court jurisdiction is foreclosed. The fact that "the applicable law in a federal enclave ... is that promulgated by the United States, does not by itself dispose of the issue of whether [a federal court has] removal jurisdiction ...." *Sopena,* 920 F.Supp. at 264. It is well established that exclusive *legislative* jurisdiction does not necessarily imply that federal courts must exercise exclusive judicial authority within a particular area. Exclusive legislative jurisdiction and exclusive judicial jurisdiction are "two different concepts"

and federal courts exercise exclusive court jurisdiction "only when the federal statute explicitly so provides." *Sopena,* 920 F.Supp. at 264; *Roberts v. U.S.O. Council of Puerto Rico,* 1998 WL 199576 (P.R.).

█ In fact, local judges apply federal law every day, and a judge of the Commonwealth of Puerto Rico is as capable of deciding whether the "enclave" doctrine bars recovery by the plaintiffs here as a federal judge.[7] No invisible wall surrounds federal enclaves generally, or the federal court in Puerto Rico specifically, necessarily putting it beyond the reach of a local court. Put differently, a prescription as to *what* law applies does not necessarily govern *who* does the deciding. The constitutional provision establishing federal enclaves does not confer subject matter jurisdiction here.

The SCA, 41 U.S.C. §§ 351–358, *is* a federal law, of course and not a constitutional provision. It is designed to protect the rights of private contract employees doing work for the federal government. This statute clearly implies that local laws conferring benefits on workers will be applicable to employees of private companies working at federal installations. The SCA requires every service contract entered into by the United States, in excess of a certain sum, to include a provision for fringe benefits "not otherwise required by Federal, State, or local law to be provided by the contractor or subcontractor." 41 U.S.C. § 351(a)(2). This language manifestly assumes the application of local laws benefitting workers, and adds other provisions to insure that benefits and protections for contract employees reach a cer-

---

**6.** Technically, this constitutional provision, being directed only at states, is not applicable to Puerto Rico. *See Moore v. Corte,* 59 D.P.R. 620, 624, 1941 WL 8249 (1941). However, the Puerto Rico Supreme Court has recognized that the interpretive jurisprudence of this clause should apply to the Law of February 16, 1903, which gave consent to the United states to acquire land in Puerto Rico for public purposes. *See Roberts v. USO Council of Puerto Rico,* 1998 WL 199, 576 (P.R.). Decisional law construing this constitutional

provision is therefore drawn on to define the limits of federal power within federal enclaves in the Commonwealth of Puerto Rico. *See, e.g., Sopena v. Colejon Corp.,* 920 F.Supp. 259 (D.Puerto Rico 1996).

**7.** In *dicta* below, this court will offer its opinion that the "enclave" argument is unpersuasive and that recovery should not be barred on that rationale.

tain minimum. The Christmas bonus and sick leave policies at issue here, it would seem, fall in the category of fringe benefits that *are* "otherwise required" by local law.

Plaintiffs take the position that the SCA constitutes a clear Congressional signal that local regulation of employment benefits within federal installations is intended to be permitted. The Supreme Court has recognized that when "clear and unambiguous" authorization is given by Congress, local regulation will be allowed, even within a federal installation. *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 180, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). Defendant vigorously disagrees with this interpretation of the SCA and interpretive federal law. Plaintiffs contend that their dispute with the defendant over the import of the SCA presents a substantial federal question "that need[s] to be resolved by the federal courts." Although their position has superficial support, closer analysis reveals that the law is to the contrary.

The mere fact that resolution of a piece of litigation requires interpretation or application of a federal statute does not give federal courts subject matter jurisdiction. As noted above, state courts interpret and apply federal law constantly, in cases clearly outside the boundaries of federal court jurisdiction.

■ Even when state courts adopt inconsistent viewpoints on the correct interpretation of federal law—as plaintiffs argue the local courts have done here—a federal district court is not empowered to step outside jurisdictional boundaries and construe the federal statute. A United States District Court Judge's interpretation of the SCA is not necessarily any more definitive than an interpretation offered by a state judge. Morevover, federal trial judges may disagree with each other as easily as state trial judges. To repeat, the mere necessity to construe and apply a federal statute will not, in itself, give a federal court jurisdiction, unless the intent of Congress was to preempt entirely state

law and confer exclusive jurisdiction on the federal court, which was not the case here.

*Popular Democratic Party v. Puerto Rico,* 24 F.Supp.2d 184 (D.Puerto Rico 1998), is not to the contrary. In that case a political party and individual citizen filed a lawsuit in the Court of First Instance of the Commonwealth of Puerto Rico, Superior Court of San Juan, challenging a plebiscite permitting Puerto Rican voters to express their preference regarding "the scope of United States sovereignty over Puerto Rico and the political condition of the citizens who reside on the [I]sland." *Id.* at 186. The case was removed to federal court and plaintiffs filed a motion to remand. In a thoughtful and painstaking overview of both the rules governing subject matter jurisdiction and the federal law bearing on the issues presented in that complaint, Judge Perez–Gimenez denied the motion.

His decision does not support the broad interpretation plaintiffs here would give it: that federal subject matter jurisdiction arises whenever a complaint involves a "substantial" federal question. Indeed, he explicitly recognizes that "the mere fact that the construction of a federal law probably will determine the outcome of a state law cause of action" is *not* enough to support federal subject matter jurisdiction. *Id.* at 189. On the contrary, his decision notes that "*only* federal law, rather than local law" defined the issues raised in the complaint before him. *Id.* at 191 (emphasis supplied).

He concludes:

Plaintiffs' first and fifth causes of action do not merely invoke questions of purely local constitutional law regarding the rights and obligations amongst Puerto Rico's branches of government .... The issue raised, while labeled by plaintiffs in such terms, is inescapably and in reality one about the power of Congress to legislate for the island pursuant to the

Territorial Clause [U.S. Const. art. IV, § 3].

*Id.* at 195 (internal citations omitted).

Properly viewed, the *Popular Democratic Party* decision is a straightforward application of the "well pleaded complaint" rule, concluding, in the very particular circumstances of that case, that at least as to two counts in the complaint the cause of action itself grew entirely out of federal law.

The case now before this court is much different. Plaintiffs are asserting garden variety claims for ordinary fringe benefits defined explicitly by state employment law. The mere fact that the plaintiffs' work site, a federal courthouse, makes application of that law complicated in one respect does not bestow subject matter jurisdiction on the federal court.

Plaintiffs' argument might be persuasive if there was evidence that Congress intended the SCA to be completely preemptive of any state law claims regulating employment benefits for employees of federal contract agencies. Ironically, however, if plaintiffs succeeded on this argument, they would prevail in their quest for federal subject matter jurisdiction, but *ex hypothesis* lose on the merits of their claim, since the SCA, not local law, would entirely govern the question of employment benefits. This indeed is a principal argument of the defendant.

In any case, any argument of SCA preemption, whether offered by the plaintiffs or the defendant, is flawed because the SCA fails to meet the first requirement of complete preemption. The SCA does not afford a private right of action, *see* 41 U.S.C. §§ 352(b), 354. For complete preemption to exist, the court must find that:

Congress desired to control the adjudication of the federal cause of action to such an extent that it did not just provide a federal defense to the application of state law; rather, it replaced the state law with federal law and made it clear

that the defendant has the ability to seek adjudication of the federal claim in a federal forum.

14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722.1 (3d ed.1998). By foreclosing a private right of action, Congress has done just the opposite of what is required for complete preemption to exist. The failure of Congress to provide a private right of action shows that it does *not* intend the SCA to occupy the whole field. *See BIW Deceived,* 132 F.3d at 832. Because the SCA fails to meet the first requirement of complete preemption, the court need not discuss the other two requirements.

Instead, plaintiffs' preemption argument, at best, asserts "ordinary" preemption, which is insufficient to maintain federal question jurisdiction. *See Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). In ordinary preemption, unlike complete preemption, adjudication of plaintiff's state law claim merely requires application of federal substantive law. 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722.1 (3d ed.1998). That is precisely the circumstance this case presents: plaintiffs pled state law to support the claims in their complaint, and defendant answered asserting federal law as a defense. Adjudication of this case may require application of federal substantive law—the "enclave" doctrine and the SCA—but, as discussed above, federal law does not completely preempt plaintiffs' state claims because Congress did *not* intend to occupy the entire field in enacting the SCA.

In sum, the Superior Court of the Commonwealth of Puerto Rico possesses jurisdiction to adjudicate the claims made by the plaintiffs under local law. If necessary, the Superior Court Judge can construe and apply the federal enclave and SCA defenses offered by the defendant. Unfortunately, however, without either di-

versity or federal question jurisdiction, any judgment rendered by this *federal* court would be immediately vacated on appeal. To reach for jurisdiction beyond proper bounds would accomplish nothing and would compound delay.

For the foregoing reasons this case will be ordered remanded to the Superior Court in San Juan, in accordance with 28 U.S.C. § 1447(d). This provision states that an order remanding the case "may require payment of just costs and actual expenses, including attorney fees, incurred as a result of the removal." *Id.* In this case an award of costs, expenses and fees is appropriate. The defendant removed the case without proper justification. Its argument in opposition to remand now—that *Sopeña* had not been decided at the time of removal—ignores the well-established law cited by Judge Gierbolini in that opinion. Plaintiffs' counsel, who properly filed the case originally in Superior Court, has been forced to oppose remand now just to avoid further delay. Counsel for the plaintiffs will be given thirty days to submit a memorandum and affidavit setting forth all fees and expenses incurred as a result of the defendant's improper removal of this case to federal court. Defendant will thereafter be given fourteen days to show cause why an award of the fees and expenses requested would not be, in the words of the statute, "just."

## IV. THE MERITS

If an appellate court were to find that this court is incorrect about the lack of federal jurisdiction here, then what follows would be the court's holding. As a practical matter, however, since it does not appear that an appeal from an order of remand under these circumstances is permitted under 28 U.S.C. § 1447(d), the balance of this memorandum constitutes *obiter dicta.*

---

**8.** The facts, unless noted otherwise, are taken from the parties' Joint Submission of Stipu-

## A. FACTUAL BACKGROUND

In 1903, by statute, Puerto Rico authorized the conveyance of certain lands to the United States for various public purposes. *See* 1903 P.R. Laws 111–112. On March 3, 1942, by title of condemnation, the United States acquired the land where the federal courthouse in Hato Ray now lies. With the purchase of this land by condemnation, the United States acquired exclusive jurisdiction over the property. *See* 1903 P.R. Laws 112.

As noted, plaintiffs are CSOs at the federal courthouse in Hato Rey, Puerto Rico. To become a CSO, an individual must pass the United States Marshal Service ("USMS") security clearance and meet USMS eligibility requirements.[8] GSSC screens and interviews individuals; the USMS, however, is vested with final hiring authority. Once hired, the individual is deputized as a "Special Limited Deputy United States Marshal." All uniforms and weapons are provided by the USMS and all overtime must be approved by the USMS. Similarly, the USMS applies and enforces the USMS Code of Conduct to the CSOs' performance and has the sole discretion to have a CSO removed.

Under contract with the USMS, CSOs perform a number of functions. For instance, CSOs are the first line of security for the courthouse and are responsible for enforcing the building's rules and keeping dangerous weapons and unauthorized electronic equipment from entering the courthouse. Similarly, CSOs are responsible for assisting the USMS in protecting the Judiciary. In this role, CSOs are authorized to take appropriate action against those who threaten the court, including, when necessary, disarming unauthorized individuals, using a firearm, and performing bomb drills.

During the hearing on April 28, 1998, plaintiff and defendant each called one wit-

lated Facts.

ness. Few, if any, contested facts arose from the hearing. The following findings of fact are made based on the testimony.

Julio Ruiz testified for the plaintiffs. Ruiz pointed out that CSOs are not authorized to perform a number of duties typically performed by federally employed Deputy United States Marshals. They are prohibited from having contact with prisoners, they cannot perform any escort services outside the premises of the courthouse, and they are not allowed to drive government vehicles. Although a CSO may go to a Marshal with questions concerning his job, within the structure of the organization, he is more likely to seek assistance from his GSSC supervisor.

Eddie Villafañe, the highest GSSC representative in Puerto Rico during the dates in question, testified for the defendant. Villafañe provided detail concerning the management relationship between the USMS and GSSC. According to Mr. Villafañe, GSSC and the USMS share responsibility on disciplinary issues: the USMS sets the criteria for violations, and either party may initiate disciplinary proceedings. The USMS, however, is the only entity authorized actually to discharge an individual.

Villafañe described the CSOs' benefits. Villafañe was himself responsible for computing daily attendance and transferring this information to a monthly report. GSSC then paid the individual and, based on this report, with the signature of the Marshal designated as the CSO coordina-

tor, GSSC billed the USMS for the individual's services. Additionally, GSSC, not the USMS, paid all state and federal taxes, local disability benefits, and general liability insurance for each CSO in its employ.

During the April 28, 1998 hearing, in addition to testimony, the parties submitted supplemental documentary evidence. Of particular help to the court were the USMS Policy and Procedure Manual Volume X: Judicial and Court Security ("Policy Manual") and the contract between GSSC and the USMS ("contract").

As noted, the USMS provides CSOs with all required equipment and uniforms. In both the policy manual and the contract, however, the Government expressly disclaimed any liability arising from the CSOs' use of the equipment. *See* Contract, p. C–32, 8.0; Policy Manual, p. 10–37, 10.4–15(b)(5). Similarly, while the USMS established standards of conduct, GSSC was responsible for ensuring that CSOs maintained satisfactory standards. *See* Contract, p. C–33, 2.1; Policy Manual, p. 10–32, 10.4–8(d).

Of particular note, the Policy Manual stated that the contractor, here GSSC, assumed full liability for any act of a CSO in the exercise of his authority.[9] Policy Manual, p. 10–35, 10.4–13(b). By contrast, under the parallel provision in the contract, the CSO was held personally responsible "for any misuse, loss, misrepresentation of his/her credentials or the authority associated with the CSOs' special deputation."[10] Contract, p. C–14, 6.1.1. However, the

---

**9.** The Policy Manual provides:
Because this deputation is conveyed so that the CSO may fully execute his or her contract duties, *the contractor [GSSC] assumes full liability* for any act of the CSO in the exercise of this authority. In certain circumstances, however, the Department of Justice may provide legal representation to a CSO who is sued on account of the performance of his or her contract duties on behalf of the USMS.
Policy Manual, p. 10–35, 10.4–13(b) (emphasis supplied).

**10.** The contract provides:

In order to fully carry out the judicial security services required, the CSO shall receive special, limited deputation through the local U.S. Marshal and will be issued CSO Credentials for identification purposes. This deputation shall be limited to the extent that it will only apply while the CSO is at the Federal work site, during his actual shift and while performing contract duties. *The CSO will be held personally responsible* for any misuse, loss, misrepresentation of his/her credentials or the authority associated with the CSO's special deputation .…
Contract, p. C–14, 6.1.1 (emphasis supplied).

contract specifies that the contractor, here GSSC, shall provide adequate Worker's Compensation, Employee's Liability and general public liability insurance covering all duties, services, and work to be performed under the contract.[11] *See* Contract, p. H–3, H–6(A)1–3.

Under Puerto Rico's Act No. 148 of June 30, 1969, P.R. Laws Ann. tit. 29, §§ 501–507 (1995), employers are required to pay employees who have worked more than seven hundred hours in the previous year a two-percent bonus.[12] This bonus is commonly referred to as a "Christmas bonus." Federal labor law does not entitle workers similarly situated to a like bonus.

Plaintiffs also claim entitlement to a more generous sick leave policy than that provided by GSSC. The Contract, the Policy Manual, and the Joint Stipulations of Fact are all silent on the issue of accrual of sick time. Counsel for both sides, however, have represented to the court that GSSC's policy was to award CSOs with no more than five sick days per year.

Puerto Rico law does not provide a minimum standard for accrual of sick time. *See* P.R. Laws Ann. tit. 29 §§ 271–299 (1995). However, pursuant to the authority vested in it by the legislature, the Commonwealth of Puerto Rico Department of Labor and Human Resources Minimum Wage Board produces Mandatory Decrees that hold the force of law. Mandatory Decree No. 74, Fourth Revision (1982), applies to the Watching and Protective Service Industry of which plaintiffs claim to be members, and sets forth minimum requirements for accrual of vacation and sick time. Under this decree, employees who work full time during any month are entitled to one sick day. An employee working full time for one year, therefore, is entitled, under Puerto Rico law, to twelve sick days per year.[13]

The substantive issues before the court—putting aside the defendant's Motion to Reconsider, which is addressed below—have been reduced to two. First, as a matter of law, does the fact that plaintiffs work within a federal "enclave" mean that local laws regarding fringe benefits do

11. The contract provides:
1. $100,000 per incident minimum Worker's Compensation and Employee's Liability Insurance.
2. General public liability insurance covering all duties, services, and work to be performed under this contract. The insurance shall provide limits of liability for bodily injury not less than $2,000,000 per person and $5,000,000 for each occurrence, and property damage limits of liability of not less than $200,000 for each accident. The general liability policy shall name "The United States of America, action by and through the Department of Justice", as an additional insured with respect to operations performed under this contract.
3. Automobile Liability Insurance written on the comprehensive form of policy of $1,000,000 per person and $5,000,000 per occurrence for bodily injury, and $200,000 per occurrence for property damage.
Contract, p. H–3, H–6(A)1–3.

12. Section 501 states:
Any employer who employs one or more workers or employees within the period of

twelve (12) months comprised from the first of October of any calendar year until September 30 of the subsequent calendar year shall be bound to grant to each one of said employees who have worked seven hundred (700) hours or more ... within the period set forth, a bonus equivalent to 2% of the total wages, computed up to a maximum of ten thousand (10,000) dollars, earned by the employee or worker within the said lapse of time.
P.R. Laws Ann. tit. 29 § 501 (1995).

13. Mandatory Decree No. 74 provides, in relevant part:
Every employee ... shall be entitled to sick leave with full pay at the rate of one (1) working day for each month during which he has worked at least one hundred and twenty (120) hours, and at the rate of half ( ½) a working day for each month during which he has worked less than one hundred and twenty (120) hours but not less than sixty (60). Provided that the employee who works less than sixty (60) hours during any month shall not accrue sick leave for that month.
Mandatory Decree No. 74, p. 3.

not apply? Second, as a factual issue, is GSSC an instrumentality "so closely connected to the government that the two cannot be realistically viewed as separate entities?" *United States v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982). If the answer to either question is in the affirmative, then defendant is entitled to judgment in its favor on the merits.

### B. *The Federal "Enclave" Issue*

Plaintiffs concede that they work within a federal enclave, and the parties' agreement on this point is well supported by decisional law. *See James v. Dravo Contracting Co.,* 302 U.S. 134, 142–43, 58 S.Ct. 208, 82 L.Ed. 155 (1937); *People of Puerto Rico v. Koedel,* 927 F.2d 662, 666 (1st Cir.1991); *West River Elec. Ass'n Inc. v. Black Hills Power and Light Co.,* 719 F.Supp. 1489, 1499 (D.S.D.1989).

As with the discussion of jurisdiction, however, the crucial question is not whether a federal "enclave" exists, but what its legal significance may be. The basic rule has been set forth by the Supreme Court in *Paul v. U.S.,* 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963):

> If the United States acquires with the "consent" of the state legislature land within the borders of that state by purchase or condemnation for any of the purposes mentioned in Art. I, § 8, cl. 17, or if the land is acquired without such consent and later the state gives its "consent," the jurisdiction of the Federal Government becomes "exclusive."

*Id.* at 264, 83 S.Ct. 426.

Thus, the court starts with the premise that, generally, within a federal "enclave" only federal law applies.[14] One significant exception to this general doctrine, however, was set forth in *Goodyear Atomic*

*Corp. v. Miller,* 486 U.S. 174, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). Federal installations "are shielded by the Supremacy Clause from direct state regulations *unless Congress provides 'clear and unambiguous' authorization for such regulation.*" *Id.* at 180, 108 S.Ct. 1704. (Emphasis supplied).

▌Although the question is admittedly close, it is this court's view that the Service Contract Act of 1965, 41 U.S.C. § 351 ("SCA"), constitutes the clear and unambiguous signal of Congressional intent, as required by the *Goodyear Atomic* case.

Two points must be kept clear. In reaching its conclusion, the court does not intend to suggest that the complaint actually sets forth a claim under the SCA, which it could not, because (as noted above) the SCA provides no private right of action. Still less does the court mean to imply that the SCA preempts local law in this case; for the reasons previously stated this statute clearly does not reflect Congress' intent to preempt the relevant field, as it has in enacting ERISA and the LMRA.

Rather, the SCA´ constitutes a recognition by Congress that federal contract employees will enjoy the benefit of local laws governing fringe benefits. This Congressional intent is unmistakably communicated by the wording of the statutory enactment itself. Fringe benefits for contract employees who furnish services to the government "shall include medical or hospital care, pensions, occupational injury compensation, unemployment benefits, vacation and holiday pay, etc. and other bona fide fringe benefits *not otherwise required by Federal, State or local law to be provided by the contractor or subcontractor.*" 41 U.S.C. § 351(2)(1987) (emphasis supplied). While it is true that the statute does not

---

**14.** One possible exception to this doctrine— the continuing applicability of local law existing at the time the property was ceded to the federal government—need not be addressed. It is not contested that the laws plaintiffs seek to invoke came into being after the date this

the site in question passed into the hands of the federal government. *See, Kelly v. Lockheed Martin Services Group,* 25 F.Supp.2d 1, 4 (D.Puerto Rico 1998) ("In effect, the state law at the time of cession becomes federal law.").

explicitly state that local laws will apply, no fair reading of the emphasized phrase makes possible any other construction of the language. A message does not have to be *in haec verba* to be "clear and unambiguous." The only reasonable inference to be drawn from the SCA is that local and state laws were to provide the foundation upon which the SCA was to be built, to insure that contract employees received certain minimum benefits. The application of local law providing separate and independent employment benefits, such as the law of Puerto Rico here, was unambiguously assumed.

This construction of the SCA was presaged by *dicta* in *Kelly v. Lockheed Martin Services Group*, 25 F.Supp.2d 1 (D.Puerto Rico 1998), where Judge Dominguez states that the SCA "requires service contractors working for the United States to comply with local minimum wage, fringe benefit, safety and notification laws." *Id.* at 6.[15]

For these reasons, while defendant is correct (and plaintiffs do not disagree) that their work site is a federal "enclave," this fact does not bar their recovery of fringe benefits conferred by· local employment law. Indeed the SCA, by clear implication, establishes that such laws are applicable.

## C. The "Agency" Issue—United States v. New Mexico

Defendant argues that because the plaintiffs are "performing federal functions" they are not subject to local employment laws. *See* Brief in Support of Motion for Summary Judgment, at 13. No decisional law addressing employee benefits is offered in support of this argument. Instead, defendant relies primarily on *United States v. New Mexico* and other cases discussing the power of local authorities to tax activities occurring at federal installations.

Even within its context this line of cases would offer precious little support for defendant's position. The attempt to torture these tax-related cases into a rationale applicable to this case is unpersuasive. Moreover, even if the law had some applicability, the facts as they emerged from the testimony and the parties' submissions simply fail to support defendant's argument.

In *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), the federal government brought suit against the state, seeking a declaratory judgment to the effect that New Mexico could not tax two of its private contractors, Sandia Corporation and Zia Company. The district court granted judgment for the government, on the ground that an "agency relationship" existed between the private contractors and the federal government. *Id.* at 729, 102 S.Ct. 1373. The Tenth Circuit reversed, and the Supreme Court unanimously affirmed the Court of Appeals' decision, holding that tax immunity is appropriate only when the tax falls directly on the United States, or "on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *Id.* at 735, 102 S.Ct. 1373.

Following this decision, the Supreme Court and various appellate courts have addressed particular tax levies by states and municipalities against instrumentalities claiming immunity due to their proximity to, or similarity with, federal governmental enterprises. *See e.g., United States v. California*, 507 U.S. 746, 748, 113 S.Ct. 1784, 123 L.Ed.2d 528 (1993); *Washington v. United States*, 460 U.S. 536, 537,

---

**15.** In reaching this decision the court is aware of the apparently contrary decisions in *Koren v. Martin Marietta Services, Inc.*, 997 F.Supp. 196 (D.Puerto Rico 1998), and *Roberts v. U.S.O. Council of Puerto Rico*, 1998 WL 199576 (P.R.). Both these decisions held that Puerto Rico's employment laws do not cover workers at the United States' naval base at Roosevelt Roads. However, neither decision addressed the SCA's expression of Congressional intent that local laws regarding fringe benefits apply to federal contract employees.

103 S.Ct. 1344, 75 L.Ed.2d 264 (1983); *United States v. County of San Diego*, 965 F.2d 691, 694 (9th Cir.1992).

All of these cases, as noted, have addressed the limited issue raised when a locality attempts to levy a tax on a federal official or some private entity claiming equivalent status. Even if this case involved a claim that the federal contractor here is somehow exempt from local taxation, which obviously is not claimed, much more than a showing that GSSC "performs federal functions," as defendant argues, would be needed to exempt the employer from the local levies. As the Supreme Court noted in *New Mexico*, "a finding of constitutional tax immunity requires something more than the invocation of traditional agency notions . . . ." *Id.* at 736, 102 S.Ct. 1373.

Of course, this is not a tax case. It is therefore doubtful whether the *New Mexico* line of cases is even helpful. In *Ferguson v. United States*, 712 F.Supp. 775 (N.D.Cal.1989), the court held that *New Mexico* does not control in a case addressing liability for a tort because "[t]ax immunity is simply not analogous. . . ." *Id.* at 783. Similarly here, it is hard to discern how cases arising from the tax context could throw much light on the question of the applicability of employment laws. As noted, whatever dim light these cases do cast is unflattering to defendant's position here. Being a private "agent" of the federal government or "performing federal functions" is flatly insufficient to avoid local regulation, at least in the tax area.

■ Moreover, viewing the facts of this case, it is clear that GSSC maintains a crisply defined, independent relationship with the USMS and the government generally. GSSC is far from being "an instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities."

First, in both the policy manual and the contract, the Government expressly disclaims any liability arising from the CSOs'

use of equipment, including Government vehicles. In this regard, under the contract, GSSC is required to provide adequate, independent liability insurance for each CSO.

Second, the Policy Manual states that the contractor, here GSSC, assumes full liability for any act of a CSO taken in the exercise of his authority. The Policy Manual holds the CSO personally responsible "for any misuse, loss, misrepresentation of his/her credentials or the authority associated with the CSO's special deputation." Moreover, the contract specifies that GSSC is required to provide adequate Worker's Compensation, employee's liability and general public liability insurance covering all duties, services, and work to be performed under the contract. Clearly, under both the Policy Manual and the contract, the USMS and GSSC maintain clear independence on the important issue of liability.

Third, under the contract and in the Policy Manual, GSSC is responsible for assuring that the CSOs live up to the standards set forth by the USMS. Defendant would have the court focus entirely on the USMS's overall right to set the performance standards. Admittedly, the USMS retains appropriate power as the contracting and policy-making authority, but the Ruiz testimony, which this court has found credible, made it crystal clear that in day-to-day operations for the on-duty officers, the source of command was GSSC supervisory personnel maintaining direct control over the CSOs.

Fourth, it is clear that the authority of the CSOs, like that of guards generally, is highly specific both as to time and place. Away from the job site, they have no general powers. Even on the site, when they are between shifts, or merely visiting, they have no power. Although they may be "specially deputized" by the USMS, their role and their duties are vastly different and, in many ways, much more limited than those of general law enforcement officers, or of Deputy U.S. Marshals specifi-

cally. It is hard to believe that anyone familiar with the USMS could suggest a predominant similarity between the USMS and the GSSC.

To conclude, even if the CSOs employed by GSSC were "agents" of the USMS, performing "federal functions," their status would not exempt GSSC from local taxation under the *New Mexico* decision and its progeny. Of course, since this case is not about local taxing authority, *New Mexico* and its progeny have doubtful relevance. In any case, the CSOs, as a matter of fact, are not the functional equivalent of direct federal employees to the extent that local regulation of their . employer is barred. This conclusion should not be interpreted in any way to suggest that the performance of duties as a CSO requires anything less than the highest level of professionalism, training, courtesy and, at times, courage. Though they may be closely supervised by the USMS, however, they are simply not the equivalent of federal employees for purposes of the issues raised in this lawsuit.

In sum, neither the "enclave" doctrine nor the Supreme Court's *New Mexico* decision bar application of local laws governing fringe benefits in this case.

## V. MOTION TO RECONSIDER

The motion to reconsider will be denied as moot, since this case will be dismissed for lack of subject matter jurisdiction. As before, however, given the time spent by the court addressing the underlying issues, the following is offered as *dicta.*

The defendant moved for reconsideration of this court's adoption of the Magistrate Judge's Report and Recommendation on two arguments raised in its initial motion for summary judgment. First, defendant argues that the court was over-hasty in rejecting its argument that the SCA preempts any claims under the local employment law of Puerto Rico. Second, the defendant argues that the plaintiffs are not "guards" and therefore not eligible for benefits conferred on persons in that sta-

tus. Both arguments may be disposed of quickly.

First, for the reasons set forth at length above, the SCA was never intended by Congress to govern entirely all issues relating to benefits for contract employees. The language of the statute does not even claim to do that; instead, it clearly recognizes the applicability of local law. Most importantly, the SCA carries with it no private right of action. To the extent that small inconsistencies between the SCA and local law require adjustments, these differences do not suggest that local law should therefore be thrown out entirely. Of great significance, and persuasive force, on this point is the opinion of the District Director of the Wage and Hour Division of the Department of Labor in Puerto Rico, noted in the Report and Recommendation at 8, to the effect that an employer is *not* excused from complying with local law merely because the employee happens to be covered by the SCA. This opinion makes it obvious that the differences between the SCA and local law are far from insuperable.

Second, this court finds as a matter of fact that the CSOs are guards, fully covered by the applicable Decree. The clearest and most obvious evidence on this point is that a CSO's power is limited to a particular location, here the courthouse. Like all guards, the CSO has no general law enforcement duty and no authority off-site. It is perfectly correct to refer to on-duty CSOs as "officers," since within the courthouse that is what they function as, and what they are formally called. As far as categorization for purposes of this litigation, however, they are guards.

## VI. CONCLUSION

For the foregoing reasons, due to a lack of subject matter jurisdiction, the court hereby orders the complaint dismissed and remanded to the Superior Court of the Commonwealth of Puerto Rico for further

proceedings. The motion for reconsideration is DENIED.

As noted, an assessment of costs and attorneys fees upon the defendant for the improper removal of this case, as permitted by 28 U.S.C. § 1447(d), is appropriate here. Counsel for the plaintiffs will have until May 12, 2000 to submit a memorandum and supporting affidavit specifying the reasonable fees and costs to be awarded, with contemporaneous time records if possible. Counsel will have until May 26 to respond. The court will retain the case until this issue is disposed of.

A separate order will issue.

## ORDER

For the reasons stated in the accompanying Memorandum, due to a lack of subject matter jurisdiction, the court hereby orders the complaint dismissed and remanded to the Superior Court of the Commonwealth of Puerto Rico for further proceedings. The motion for reconsideration is DENIED.

As noted, an assessment of costs and attorneys fees upon the defendant for the improper removal of this case, as permitted by 28 U.S.C. § 1447(d), is appropriate here. Counsel for the plaintiffs will have until May 12, 2000 to submit a memorandum and supporting affidavit specifying the reasonable fees and costs to be awarded, with contemporaneous time records if possible. Counsel will have until May 26 to respond. The court will retain the case until this issue is disposed of.

It is So Ordered.